## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARSHAL T. SIMPSON, | ) | |
| INDIVIDUALLY AND AS TRUSTEE OF | ) | |
| THE MARSHAL T. SIMPSON TRUST, | ) | |
| AND DONALD S. SIMPSON, | ) | |
| INDIVIDUALLY AND AS TRUSTEE OF | ) | |
| THE DONALD S. SIMPSON TRUST, | ) | |
| and CHRISTOPHER BOYD, | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 18- |
| | ) | |
| v. | ) | |
| | ) | **TRIAL BY JURY DEMANDED** |
| WILLIAM DIRKS DAMERON, LLC | ) | |
| and MATTHEW L. DAMERON, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Marshal T. Simpson ("Mr. Simpson"), individually and as trustee of the Marshal T. Simpson Trust, Donald S. Simpson, individually and as trustee of the Donald S. Simpson Trust, and Christopher Boyd (collectively, the "Clients" or "Plaintiffs"), by and through their undersigned counsel, hereby bring this complaint against William Dirks Dameron, LLC (the "Firm") and Matthew L. Dameron ("Matt" and, together with the Firm, "Dameron"), alleging upon knowledge with regard to themselves and their own acts and upon information and belief as to all other matters as follows:

## NATURE OF THE ACTION

1.      This action arises from a catalogue of mind-boggling professional incompetence that resulted in the Clients' unknowing forfeiture of their legitimate legal claims against a company and its directors who defrauded them of their $600,000 investments. By failing to follow through with a Section 220 Demand (later defined), Dameron failed to avail itself of the Clients' right to

take pre-fraud suit discovery of the company, a failure that, three years and at least as many chances to amend the Complaint later, caused Matt to state in open Court that he lacked sufficient facts to make the allegations in the Complaint plausible enough to push the matter beyond the motion to dismiss stage, thereby dealing the coup de grace to the Clients' cause.  It takes not expert witness to establish that clients do not hire legal counsel to willfully ignore their legal rights and passively watch their claims being obliterated by defense counsel.  This is precisely what happened here.  Below is a brief summary of how we got from there (cause of action) to here (no cause of action):

2.      Following its failure to compel production of records via an 8 Del. C. § 220 action, Dameron, on behalf of the Clients, files suit against Invicta (later defined) and certain of its directors without the benefit of those records.  As is pointed out in the motions to dismiss triggered by its filing, it did so in the wrong court, something that might have occurred to Dameron before instigating suit, had it included the required jurisdictional allegations in the Complaint.  Had it not been for the District Court for the Western District of Missouri generously permitting Dameron to make jurisdictional submissions *ex post facto*, the Complaint would have been dismissed right then and there.  Instead, the court, sympathetic to Dameron's (self-inflicted) statute of limitations woes, transferred the Complaint for want of jurisdiction to the District of Delaware.

3.      Once in Delaware, the Court orders Dameron to finally serve Invicta.  To its credit, Dameron previously once attempted to do so, but that attempt failed because a company whose charter, like Invicta's, has been revoked for failure to pay franchise taxes cannot be served, as Dameron endeavored to do here, by serving its (non-existent) registered agent.  Realizing its mistake, Dameron once sought and obtained an extension of the Rule 4(m) service deadline but,

apparently frustrated by its thwarted service efforts, blew the new deadline and, for the time being, abandoned service altogether. Until the Court orders service, that is.

4.     Before Dameron finally serves Invicta, a new round of motions to dismiss the Complaint by the Director defendants are briefed and granted. It is then that the Court dismisses certain counts of the Complaint against them, correctly finding that Dameron (something that research on Delaware law would have revealed before instigating suit) could not maintain the Clients' direct claims against the Directors, but instead should have made a demand against Invicta and sued them *derivatively*. It also points out the obvious logistical problem with the Complaint's attempts to obtain relief derivatively *on behalf of* and simultaneously *against* the company. In its opinion dismissing, without prejudice, the Complaint, the Court sets forth its various deficiencies, including: one count is not recognized under Delaware law; virtually all causes of action are time-barred because the Complaint, on its face, fails to set forth *any* facts that would make its conclusory allegation that tolling applies plausible; Dameron does not plead the required elements for fraud (such as reliance); and, in fact, Dameron's "threadbare recital[s] of the elements of a cause of action" fail to meet even the post-*Twombly/Iqbal* Rule 8 pleading standard (which is likely why Dameron, in its response to the motions to dismiss, relies on pre- *Twombly/Iqbal* cases).

5.     With Invicta served (two years into the suit), the Court orders Dameron to seek entry of default against the company, which the Court, after Dameron dutifully complies, grants. Meanwhile, defense counsel is reviewing and analyzing the Court's opinion dismissing the Complaint against the Director defendants *without prejudice* and is readying for an amended complaint. No such thing. In May 2017, Dameron announces that it would not amend, because it had resigned itself to the fact that "[g]iven the scope of the Director Defendants' Motion, it seems

unlikely that there is any version of the Complaint that would satisfy *them*." (*emphasis* added). How about just satisfying *Twombly* and *Iqbal*?

6.      In the meantime, Invicta files a motion to vacate the default judgment (which is unopposed and granted) and motion to dismiss the Complaint on virtually identical grounds as those cited by the Director defendants and, additionally, because the Court's opinion is now law of the case (based on Dameron's failure to amend). Before Dameron responds, the Court convenes for a Rule 16(f) conference, where it *bends over backwards* to find something of substance in the Complaint. It also educates Matt on basic legal principles (state and federal)[1] and walks him through, paragraph by paragraph, the Complaint and how he should amend to withstand dismissal. The Court even suggests that Matt renew the Section 220 Demand. But, instead of availing itself of Rule 15(a)(1)(B) or section 220, Matt, after a brief break over the weekend (arguably deserved in light of three years of whacking by defense counsel and the courts), recycles his response brief for what must be the fourth or fifth time. Not surprisingly, the Court does not even trouble defense

---

[1]      For example:

> MR. DAMERON:      …[I]f you look at the law of Missouri and Kansas, the law concerning fraud in terms of the elements and the statute of limitations, they're comparable.
>
> THE COURT:  Oh, is that right?
>
> MR. DAMERON:      Yes.
>
> THE COURT:  Kansas has the same five-year kind of – the long – statute of limitations?
>
> MR. DAMERON:      Yes.
>
> THE COURT:  All right, okay.
>
> MR. BRAUERMAN (counsel for Invicta):      That's contrary to what our research indicated.
>
> THE COURT:  Yeah, I – mine too –
>
> MR. DAMERON:      Oh, really, okay.

Hr'g Tr. 18:18-19:6.

counsel with putting together a reply and, on October 18, 2017, grants the motion to dismiss with respect to all remaining defendants, this time *with prejudice*.

7.    The opinion isn't even cold yet, and Dameron notifies Plaintiffs of its intent to withdraw as counsel, given the meager prospect of a "settlement" now that three district court judges have opined on the quality (or, rather, lack thereof) of the Complaint.   Dameron files an appeal "to make sure [the Clients] rights are protected" and urges the Clients to procure substitute counsel. (One is left scratching one's head what rights are left to protect at this stage.)   Not surprisingly, given prospective counsels' unanimous agreement with Dameron that an "appeal would be summarily rejected given the conclusions drawn by the Court in its orders,"[2] the Clients are unable to secure such counsel.  This action ensued.

## THE PARTIES

8.    Plaintiff Marshal T. Simpson is a resident of the State of Kansas and the trustee of the Marshal T. Simpson Trust Dated July 26, 1991, the holder of stock in Invicta Networks, Inc. ("Invicta").

9.    Plaintiff Donald S. Simpson is a resident of the State of Kansas, and the trustee of the Donald S. Simpson Trust, also holding Invicta stock.

10.    Plaintiff Christopher Boyd is a resident of the State of Kansas and the holder of Invicta stock.

11.    Defendant William Dirks Dameron, LLC is a limited liability company organized under the laws of the State of Missouri, which is also its principal place of business.  According to the its website, the Firm "delivers legal services with large firm expertise and small firm values. We represent sophisticated clients in high-stakes litigation across the country - all with a

---

[2]     October 19, 2017 email from Matt to Plaintiffs.

contingency fee model that aligns with our clients' best interests."[3]  The Firm's fee structure makes it "well-suited to represent clients who are unable or unwilling to pay traditional hourly rates for attorney services."[4]  The Firm can be served by serving its registered agent, Michael Anthony Williams, at 100 Main Street, Suite 600, Kansas City, Missouri 64152.

12.     Defendant Matthew L. Dameron is a resident of the State of Missouri and "an equity partner" of the Firm.[5]  According to Super Lawyers, he also is a "top rated business litigation attorney."[6]  "Matt's practice focuses on representing businesses, individuals, and classes in complex litigation [and] includes class actions, individual cases, and commercial disputes."[7]  Matt can be served by serving him personally at his usual place of employment, William Dirks Dameron, LLC, 100 Main Street, Suite 600, Kansas City, Missouri 64152.

13.     Non-party Invicta is a Delaware corporation that used to be involved in the business of providing cybersecurity software.  As the Clients intended for Dameron/the Complaint to plausibly allege, Invicta's directors defrauded Plaintiffs before the company became inactive.

---

[3]     https://www.williamsdirks.com/ (last visited Jan. 27, 2018).

[4]     https://www.williamsdirks.com/referring-attorneys (last visited Jan. 27, 2018).

[5]     https://www.williamsdirks.com/matthew-l-dameron (last visited Jan. 27, 2018).

[6]     https://profiles.superlawyers.com/missouri/kansas-city/lawyer/matthew-l-dameron-892ea994-b5a0-4267-b1b8-da1dcdc25388.html (last visited Jan. 27, 2018).

[7]     https://www.williamsdirks.com/matthew-l-dameron (last visited Jan. 27, 2018).  It is unclear what, besides businesses and individuals in class actions and in individual cases, there is to represent.

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), which gives district courts original jurisdiction over civil actions where the amount in controversy exceeds $75,000 and is between citizens of different states.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims herein occurred in this District.  Defendants purposefully squandered this Court's judicial resources in connection with the underlying action giving rise to the instant matter, as is set forth in detail in two opinions this Court penned in 2017.[8]

**SUBSTANTIVE ALLEGATIONS**

**Act I**

**The Clients Secure Dameron's Services
to Prosecute their Claims against Invicta and Certain
of its Directors and Dameron Files Suit on Behalf of the Clients**

16.     After Plaintiffs discovered Invicta's mismanagement and fraud by the company's directors in late 2013, they sought to involve the FBI.  The FBI ultimately chose not to pursue the matter and advised Plaintiffs to retain private counsel.  Because they had just learned that their investment with Invicta was worthless, and not having any other savings, Plaintiffs initially had difficulty securing counsel.  Eventually, they were referred to Dameron, a firm that routinely represents clients on a contingency fee basis, and agreed to do so for the Clients.

17.     On October 31, 2014, the parties entered into an *Attorney Representation Agreement* (the "Agreement"), a copy of which is attached hereto as **Exhibit A**.  The Agreement provides, in relevant part:

---

[8]     *Marshal T. Simpson Tr. v. Invicta Networks, Inc*., 249 F. Supp. 3d 790 (D. Del. 2017) ("*Invicta I*") and *Marshal T. Simpson Tr. v. Invicta Networks*, No. 16-173, 2017 U.S. Dist. LEXIS 172247 (D. Del. Oct. 18, 2017) ("*Invicta II*").

[Dameron] shall undertake and use their best efforts to investigate the facts and conduct concerning Client's investment in Invicta Networks, Inc. and its subsidiaries. [Dameron] shall attempt to reach a pre-lawsuit settlement of CLIENT's claims for unpaid commissions and/or wages [*sic*].[9] CLIENT agrees to pay [Dameron] thirty percent (40%) [*sic*][10] of the total amount received in any pre-lawsuit settlement, after deduction of costs and expenses.

In the event there is no pre-lawsuit settlement, and [Dameron] continue[s] to believe that CLIENT has viable and potentially successful claims arising out of CLIENT's injury, [Dameron] agree[s] to continue investigation, filing, trial and appeal of those claims. In the event that [Dameron] believe[s] that CLIENT does not have viable, potentially successful and/or economically feasible claims arising out of CLIENT's employment, CLIENT agrees that [Dameron] may, in their discretion, terminate this agreement.

In consideration for [Dameron's] representation in connection with any post-lawsuit representation, CLIENT agrees to pay [Dameron], after deduction and reimbursement of court costs and expenses, as follows: forty percent (40%) of the total amount received in settlement or satisfaction from all entities responsible for said injuries and damages.

Agreement ¶¶ 1-3. In other words, Dameron agreed to investigate Plaintiffs' claims against Invicta and, if it believed those claims to be viable, pursue them by filing a lawsuit in exchange for a 40% contingency fee.

18. On June 24, 2014, Dameron serves Invicta with a books and records demand pursuant to section 220 of the Delaware General Corporation Law (the "Section 220 Demand"). The purposes of the Section 220 Demand are articulated as follows:

---

[9] Admittedly, it should have been a red flag to Plaintiffs that Dameron did not even make the effort to fix its standard engagement agreement to remove the inapplicable language "for unpaid commissions and/or wages."

[10] Another red flag.

> 1. To investigate wrongdoing or possible mismanagement by Invicta's management and/or any member(s) or committee(s) of its Board of Directors ("the Board") in connection with Invicta's efforts to obtain contracts for its services.
>
> 2. To investigate wrongdoing or possible mismanagement by Invicta's management and/or any member(s) or committee(s) of the Board in connection with Invicta's efforts to solicit and/or retain investors.
>
> 3. To investigate wrongdoing or possible mismanagement by Invicta's management and/or any member(s) or committee(s) of the Board in connection with Invicta's efforts to test and market its products.
>
> 4. To investigate wrongdoing or possible mismanagement by Invicta's management and/or any member(s) or committee(s) of the Board in connection with Invicta's management of investor funds.

*See* Ex. J at Exhibit A. The overarching theme here is the investigation of fraud and mismanagement of Invicta and the Clients' investment by the company's officers and directors. In support of the investigation, the Section 220 Demand seeks twenty-five categories' worth of documents from Invicta, spanning from offering prospectuses, financial statements, independent valuations of the company, grant proposals, spin-offs of subsidiaries, over independent testing of product developed on behalf of the company, to alleged contracts with the U.S. government. *Id*. Pursuant to section 220, a company has five business days to respond to the demand, or "the stockholder may apply to the Court of Chancery for an order to compel such inspection." 8 Del. C. § 220.

19. Five business days transpire uneventfully. The Section 220 Demand is met, on July 12, by an email by Victor Sheymov, saying, essentially, that Invicta is a defunct company with no assets to comply with the demand and that it would take him a while to recover the requested documents. *Id*. Mr. Sheymov concludes the email with "Please let me know if [you] still want me

9

to retrieve the information." *Id*. Another two uneventful weeks later, Matt responds with a lukewarm letter asking Mr. Sheymov to please prioritize the production of certain documents.

20.     Notwithstanding that no documents had been produced by Mr. Sheymov, Dameron, on November 11, 2014, believing the Clients' claims to be viable, files suit on behalf of the Clients against Delaware corporation Invicta, Mr. Sheymov, William Esrey, Robert J. Hallman, and R. James Woolsey in the United States District Court for the Western District of Missouri. A true and correct copy of the Complaint (or "Cmplt.") is attached hereto as **Exhibit B**. As is alleged in the Complaint, Mr. Sheymov was the President, CEO and Chairman of Invicta's Board of Directors, and Messrs. Esrey, Hallman, and Woolsey were members of the board. Cmplt. ¶¶ 7-10.

## Act II

## Certain Defendants File the MTD 1

21.     On April 17, 2015, Messrs. Esrey, Hallman, and Woolsey (the "Directors") file a motion to dismiss the complaint for failure to state a claim (together with the *Suggestion in Support of Motion to Dismiss Counts I, II, VII and VIII by Defendants Esrey, Hallman and Woolsey*, the "MTD 1").[11] A true and correct copy of the MTD 1 (without exhibits) is attached hereto as **Exhibit C**.[12] The MTD 1 asserts, among other things, that (a) the Complaint is time-barred; (b) the court lacks jurisdiction over the Directors; (c) the Complaint fails to sufficiently allege and plead the elements of fraud; and (d) the Complaint fails to even come close to meeting the *Twombly/Iqbal* Pleading Standard.[13] The following are some highlights from the MTD 1:

---

[11]     The motion to dismiss was not filed on Invicta's or Mr. Sheymov's behalf, presumably because Dameron at the time had not yet served them.

[12]     For the Court's convenience, a docket report setting forth the timeline of events is attached hereto as **Exhibit D**. Upon the Complaint's transmittal to the District of Delaware, the docket there was populated with the filing events that occurred in the Western District of Missouri.

[13]     The term *Twombly/Iqbal* Pleading Standard refers to the pleading standard enounced by the SCOTUS in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Plaintiffs purport to make a claim against the Director Defendants for breach of a fiduciary duty, Count I, and for negligence in the exercise of their fiduciary duties, Count II. These claims suffer from a number of defects, any of which would be fatal to the complaint, and which make necessary these longer than usual suggestions in support:

- Breach of fiduciary duty is a derivative claim. Plaintiffs lack standing to bring it directly and have not adequately pled that pre-suit demand was excused as futile.
- The Complaint pleads only conclusions. There are no facts pled about the fiduciary conduct of any of the Director Defendants. The Complaint is deficient under Rule 8 as set forth in *Iqbal* and *Twombly*.
- The negligence claim also fails because negligence in fiduciary conduct is not a recognized theory under Delaware law.
- The statute of limitations has expired.
- Plaintiffs fail to plead personal jurisdiction over Mr. Hallman or Mr. Woolsey.

MTD 1 p. 1.

Plaintiffs' breach of duty and negligence claims are derivative claims, because the injuries they allege were suffered by the corporation and the shareholders as a whole rather than themselves in their individual capacity. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). […]

**In order to sue derivatively, Plaintiffs must plead either that they made a demand on the directors to bring suit and that demand was wrongfully rejected or that they are excused from making demand because it would be futile.** Fed. R. Civ. P. 23.1(b)(3); *Gomes v. Am. Century Cos., Inc.*, 710 F.3d 811, 815 (8th Cir. 2013); *see also Stone v. Ritter*, 911 A.2d 362, 366-67 (Del. 2006); *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009). Whether demand is futile is a question of the law of the state of incorporation. *Gomes* [*v. Am. Century Cos.*], 710 F.3d [811,] 815 [(8th Cir 2013)]; *Burt ex rel. McDonnell Douglas Corp. v. Danforth*, 742 F. Supp. 1043, 1047 (E.D. Mo. 1990). Where Plaintiffs allege that the board failed to act (as may be the intent of Plaintiffs' Complaint), Delaware law requires the Complaint to "allege particularized facts that 'create a reasonable doubt that, as of the time the Complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.'" *Citigroup*, 964 A.2d at 120, quoting *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). The Complaint utterly fails to satisfy the requirements of Fed. R. Civ. P.

23.1 or Delaware law. ***There is no allegation that demand was made and wrongfully refused. There are no allegations of demand futility.***

*Id*. pp. 6-7 (***emphasis*** added).

> ***Plaintiffs also allege common-law negligence against the Director Defendants. Delaware law, however, does not recognize a negligence theory of director liability.*** *Citigroup*, 964 A.2d at 115 n.6 (claim of "reckless and gross mismanagement" against directors is not recognized in Delaware). Delaware describes a director's responsibility in terms of fiduciary duty. *Id*. In any event, there are no facts alleged that are peculiar to this claim.

*Id*. p. 13 (***emphasis*** added).

> Plaintiffs attempt to plead that the statute of limitations should be tolled. Cmplt. ¶ 90-92. Delaware law recognizes three bases for tolling the statute of limitations: "(1) fraudulent concealment, (2) inherently unknowable injury, and (3) equitable tolling." *Eluv Holdings (BVI) Ltd. v. Dotomi*, 2013 WL 1200273, at *7 (Del. Ch. Mar. 26, 2013). "[P]laintiff bears the burden of showing that the statute was tolled, and relief from the statute extends only until the plaintiff is put on inquiry notice." *In re Tyson Foods, Inc*., 919 A.2d 563, 585 (Del. Ch. 2007); *see also In re Dean Witter P'ship Litig*., 1998 WL 442456, at *6 (Del. Ch. July 17, 1998) ("[T]he party asserting that tolling applies . . . bear[s] the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.")

> In federal court, allegations relating to tolling must also satisfy the pleading standard set forth in *Twombly* and *Iqbal*. *See Smithrud v. City of St. Paul*, 746 F.3d 391, 398 (8th Cir. 2014) (applying Twombly to tolling allegations). Tolling allegations consisting of "bare legal conclusions unsupported by facts" must be rejected at the pleading stage. *Silvas v. G.E. Money Bank*, 449 Fed. App'x 641, 644 (9th Cir. 2011); *see Henderson v. Reid*, 371 Fed. App'x 51, 54 (11th Cir. 2010); *see also Dean Witter*, 1998 WL 442456, at *6 n.44 ("When it is clear from the face of the Complaint . . . that Plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired".) The Complaint fails to plead facts that would justify tolling under any of the tolling theories recognized by Delaware.

*Id.* pp. 17-8. As is clear from the foregoing, even if Matt had been entirely clueless about Delaware and federal law when he launched the Complaint, at least as late as April 2015, when the MTD 1 was filed, he was on actual notice that and how the Complaint he drafted was utterly deficient under any standard. So was his employer, the Firm.

22.     In a response filed on May 29, 2015, a copy of which is attached hereto as **Exhibit E**, Dameron (i.e., the plaintiff) moves to transfer venue of the claims against the two defendants over which it might lack jurisdiction, *id*. p. 18,[14] to preserve any claims the Clients may otherwise relinquish based on Dameron's failure to file suit in the proper venue.

23.     The Director defendants reply on July 21, 2015. *See* **Exhibit F**. Their reply points out the deficiencies of Dameron's response to the MTD 1. For instance:

> ***Plaintiffs make no attempt to respond to virtually all of the bases for dismissal presented in the Director Defendants' suggestions in support of their motion to dismiss. By failing to respond to these arguments, Plaintiffs have conceded them.*** [citations omitted] Plaintiffs' brief contains no argument disputing:
>
> - Claims are Derivative in Nature: Plaintiffs' claims for breach of fiduciary duty and negligence against the Director Defendants are derivative in nature, but Plaintiffs have plead them as direct claims. *See* Doc. 17[15] at 6-7. Counts I and II must be dismissed for this reason.
> - Inherent Conflict: Plaintiffs cannot be adequate representatives because of the inherent conflict between their derivative claims on behalf of Invicta Networks, Inc. ("Invicta") and their direct claims against Invicta. *See* Doc. 17 at 8. Counts I and II must be dismissed for this additional reason.
> - No Collective Liability for Directors: Plaintiffs cannot rely on allegations that the directors, as a class, breached a fiduciary duty. *See* Doc. 17 at 8-9.1 Counts I and II must be dismissed for this additional reason.
> - Exculpation Clause: Invicta's Certificate of Incorporation contains an exculpation clause that precludes any claim

---

[14]     "Alternatively, the Court should transfer the claims action against Hallman and Woolsey."

[15]     Doc. 17 refers to the MTD 1.

against the Director Defendants for breach of the fiduciary duty of care. *See* Doc. 17 at 13. Count I must be dismissed for this additional reason.

- No Claim for Director Negligence: Delaware does not recognize a negligence theory of director liability. *See* Doc. 17 at 13. Count II must be dismissed for this additional reason.

- Elements of a Fraud Claim: The Complaint contains no allegations from which a plausible inference can be drawn that (a) Mr. Esrey knew of the alleged falsity of the statements attributed to him; (b) Mr. Esrey intended to induce Plaintiffs to rely on those statements; (c) Plaintiffs were ignorant of the falsity of those statements; (d) Plaintiffs relied on those statements; (e) Plaintiffs had a right to rely on those statements; and (f) those statements were a proximate cause of any damages suffered by Plaintiffs. *See* Doc. 17 at 27-32. Count VII must be dismissed for these reasons.

- Elements of a Negligent Misrepresentation Claim: The Complaint contains no allegations from which a plausible inference can be drawn that (a) Mr. Esrey made the statements attributed to him in the course of his business; (b) Mr. Esrey made those statements without exercising due care; (c) those statements were made for the guidance of limited persons in a particular business transaction; (d) Plaintiffs reasonably relied on those statements; and (e) those statements caused Plaintiffs consequent pecuniary loss. *See* Doc. 17 at 33-35. Count VIII must be dismissed for these reasons.

Reply pp. 1-2 (*emphasis* added).

> ***Plaintiffs raise demand futility for the first time in their opposition brief.*** *See* Doc. 26[16] at 10. ***The law does not permit this approach.*** *See Cordts-Auth v. Crunk, LLC*, 815 F. Supp. 2d 778, 796 (S.D.N.Y. 2011) ("[E]ven assuming that demand futility were applicable to the facts here, the Court would not allow Plaintiff to argue its applicability for the first time in her opposition brief.")

*Id*. p. 4 (*emphasis* added).

> ***Plaintiffs argue that demand would have been per se futile because their Complaint asserts claims against Invicta's directors.*** *See* Doc. 26 at 10. ***This is not Delaware law.*** The Delaware Supreme

---

[16]     Doc. 26 refers to Dameron's opposition to the MTD 1.

Court, in *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), directly referenced the cases Plaintiffs cite: "those cases cannot be taken to mean that any board approval of a challenged transaction automatically connotes 'hostile interest' and 'guilty participation' by directors, or some other form of sterilizing influence upon them. Were that so, the demand requirements of our law would be meaningless, leaving the clear mandate of Chancery Rule 23.1 devoid of its purpose and substance." *Id*. at 814.

*Id* (***emphasis*** added).

Plaintiffs contend that they have successfully alleged a breach of the duty of loyalty and a breach of the duty of oversight. *See* Doc. 26 at 11-13. They say Invicta failed to maintain adequate financial records and allowed its InvisiLAN patent to expire and that the Director Defendants failed to prevent these outcomes. ***Plaintiffs incorrectly perceive the duty of loyalty to be distinct from the duty of oversight*** under the factual theory set out in their response brief. Separate and apart from this mistake, Plaintiffs fail to allege the necessary facts to support any fiduciary breach.

Under Delaware law, the duty of oversight and the duty of loyalty are not separate duties; rather, a bad-faith failure to exercise oversight is a way in which a director may breach his duty of loyalty. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) …

*Id*. p. 5 (***emphasis*** added).

Plaintiffs do not dispute that Delaware's three-year statute of limitations governs Counts I and II of the Complaint. See Doc. 26 at 13. Instead, they argue that the Court should not apply the statute of limitations because they have alleged a basis for tolling. *See id*. at 14-17. Plaintiffs have failed to plead any facts from which the Court could plausibly infer that any tolling theory is applicable to this case. […]

***Plaintiffs' Complaint makes numerous allegations that, if true, ought to have put Plaintiffs on notice of any pre-November 2011 injuries alleged. Indeed, with regard to objective factors of notice, the Complaint is rather detailed.*** […] Despite all this notice, Plaintiffs contend to the Court that they could not have known until October 2013 that they had good grounds for a lawsuit. *See id*. at ¶¶ 91-92.

*Id*. pp. 7-8 (***emphasis*** added).

Plaintiffs do not even acknowledge the threshold standards established in *Twombly* or *Iqbal*. In fact, they do not cite these controlling precedents. Instead, ***Plaintiffs cite pre-Twombly/Iqbal cases which do not reflect current law.*** *See* Doc. 26 at 5-6. Also, the pre-*Twombly* cases Plaintiffs cite do not afford Plaintiffs the latitude they claim.

*Id*. p. 14 (*emphasis* added).

Plaintiffs argue that they should be excused from the Rule 8(a) pleading standard because their desultory efforts to obtain Invicta's books and records have been blocked by Mr. Sheymov. *See* Doc. 26 at 9 ("Plaintiffs undertook repeated efforts to find out information about the company, only to be rebuffed by Defendants."). [...] ***Far from excusing their failure to plead sufficient facts, Plaintiffs' refusal to file a Section 220 action makes the absence of factual allegations all the more damning. Delaware law affords Plaintiffs a mechanism through which they can gather the facts they would need to plead, which they have chosen not to use. Plaintiffs have no one to blame but themselves.***

*Id*. p. 15 (*emphasis* added).  As the foregoing illustrates, opposing counsel provided Matt with explicit guidance on how to improve and amend the Complaint (e.g., plead demand futility; state why the Clients did not discover the fraud until they did; take out the nonexistent negligence claim; remove allegations that suggest the Clients were on inquiry notice).

### Act III

### The District Court for the Western District of Missouri Declines to Get Involved in Matters Beyond Jurisdiction and Sends the Case to Delaware

24.     The District Court for the Western District of Missouri declines to get into any substantive arguments raised in the MTD 1, instead punting the disposition of matters other than jurisdiction to the District of Delaware.  In an order dated November 13, 2015, a true and correct copy of which is attached hereto as **Exhibit G**, it finds that "plaintiffs have failed to allege any facts which would support a finding of minimum contacts or purposeful availment consistent with the requirements of the Due Process Clause." *Id*. at page id # 275. "[P]laintiffs have not offered

16

even a suggestion as to the possibility of personal jurisdiction" over any of the defendants. *Id.* #277. They have "cited no authority to transfer the individual claims against Hallman and Woolsey and the applicable transfer statute, 28 U.S.C. § 1406(a) applies to the transfer of a case, not individual claims." *Id.* ##277-8. It appearing that Dameron has a statute of limitations problem, the Honorable Howard F. Sachs, in the interest of justice, transfers rather than dismisses the case. *Id.* #278.

25.     On March 18, 2016, the Clients' case is docketed in the District of Delaware and assigned to Judge Sue L. Robinson.

## Act IV

### The Director Defendants Renew their Motion to Dismiss in Delaware; Dameron Again Chooses Not to Amend the Complaint, Further Prejudicing the Clients' Claims

26.     The Director defendants renew their motion to dismiss on May 27, 2016 (together with the supporting memorandum of law, the "MTD 2"). A true and correct copy of the MTD 2 is attached hereto as **Exhibit H**. The Complaint's most arrant substantive and procedural shortcomings it describes thusly:

> ***Plaintiffs do not plead any omission or misconduct by any particular Director Defendant. The Complaint never mentions Mr. Hallman or Mr. Woolsey other than to identify them as directors.*** Cmplt. ¶¶ 8-9. Mr. Esrey is mentioned four times in the Complaint, but only in the context of the fraud and negligent misrepresentation allegations against him, not in the context of the fiduciary claims.

MTD 2 p. 3 (*emphasis* added).

> Plaintiffs' claims for breach of fiduciary duty are derivative, because the injuries Plaintiffs allege were suffered by Invicta and its shareholders generally rather than by the Plaintiffs themselves in their individual capacity. […]
>
> ***The complaint in a derivative action must comply with FRCP 23.1. A derivative complaint must plead with particularity either that demand was made and wrongfully refused or that (and why)***

> *demand is excused. Fed. R. Civ. P. 23.1(b)(3). The Complaint contains no such allegations.*
>
> A derivative complaint must also be verified. Fed. R. Civ. P. 23.1(b). The Complaint is not.

*Id.* p. 9 (*emphasis* added) and p. 9 n.8.

> *A further consequence of Plaintiffs' derivative claims is that Invicta, the corporation on whose behalf Plaintiffs purport to sue, is an indispensable party.* HB General Corp. v. Manchester Partners, L.P., 95 F.3d 1185, 1196 (3d Cir. 1996) ("[T]he Supreme Court has stated . . . that the corporation is an indispensable party in stockholder derivative actions.") […]
>
> *However, Plaintiffs have failed to join Invicta. While Invicta is a named party, it has never been served.* The Complaint was filed on November 11, 2014. D.I. 1. The deadline to complete service was therefore February 12, 2015. Fed. R. Civ. P. 4(m). Plaintiffs attempted to serve Invicta via its former registered agent (D.I. 4) but, because Invicta's corporate status had become void for failure to pay franchise taxes, Invicta no longer had the capacity to have a registered agent and service on the former registered agent was invalid. *See* 8 Del. C. § 510 (when a corporation's charter becomes void "all powers conferred upon the corporation are declared inoperative") […] Plaintiffs acknowledged that service had been invalid and sought an extension of their deadline to serve Invicta. D.I. 10 at 1 ("To date, Plaintiffs have been unable to obtain service of process on two Defendants: Invicta Networks, Inc. and Victor Sheymov.") *The Western District of Missouri granted that requested extension, giving Plaintiffs until May 15, 2015 to serve Invicta.* D.I. 11. *More than a year has passed since the extended deadline, but Plaintiffs have failed to act.* Further, Plaintiffs have no explanation for that failure, nor have they requested any further extensions. Plaintiffs have failed to join an indispensable party and dismissal of Counts I and II is required under Fed. R. Civ. P. 12(b)(7).

*Id.* pp. 10-11 (*emphasis* added).

> The Complaint fails even to identify what statements were "not true" and how those statements were false. The allegations are utterly insufficient under Rule 9(b), which requires that "the circumstances constituting fraud" be pled with specificity.

*Id.* p. 14. As the MTD 2 points out, Mr. Sheymov and Invicta apparently had not yet been served at the time, 18 months into the suit.

27. At this point *at the latest*, one would have expected Dameron to take any combination of the following actions: (a) reach out to the Clients to obtain more facts about why they were unable to discover the fraud until they did and flesh out the skimpy 3-paragraph conclusory tolling averments;[17] (b) file a section 220 complaint to immediately compel the production of documents crucial to injecting the Complaint with some factual Botox; (c) reach out to the Clients to obtain more facts regarding the Directors' misrepresentations that, among other things, induced them to invest in the company; (d) serve Invicta; (e) serve Mr. Sheymov; (f) make sure all required elements of the causes of action are plead; (g) make a demand on Invicta to sue the Directors or explain in the Complaint why such a demand would be futile (the company, after all, according to Mr. Sheymov's July 12, 2014 email, is defunct and has no funds to promptly respond to the Section 220 Demand–how could it realistically be expected to sue its Directors?); and (f) amend the Complaint. But, incredibly, Dameron takes not a single one of these actions.

---

[17]  The Complaint's conclusory allegations concerning tolling are as follows:

> Plaintiffs did not discover the facts constituting Defendants' violations until October 4, 2013.

> Plaintiffs could not reasonably have discovered the facts constituting Defendants' violations until October 4, 2013.

> Because Plaintiffs could not reasonably have discovered the facts constituting Defendants' violations until October 4, 2013, their claims accrued on that date and any applicable statutes of limitation were tolled until that date.

Ex. B ¶¶ 90-92.

19

28. Rather than amend in response to the MTD 2, Dameron re-files its standard response, in the penultimate paragraph of which he requests that any dismissal be without prejudice and leave to amend. This occurs on June 17, 2016.

29. On July 1, the Director defendants file their reply in further support of the MTD 2, a true and correct copy of which is attached hereto as **Exhibit I**. The reply makes several astute observations concerning Matt's thought processes, demonstrating that his choice to try to reason away the Complaint's pleading deficiencies in response to the MTD 2, rather than amend under Rule 15, made things significantly worse for the Clients:

> Even after their brief, Plaintiffs fail to meet the plausibility requirement with regard to the alleged falsity of Mr. Esrey's statements. ***Plaintiffs' sole basis for alleging falsity is that Mr. Esrey's 2008 statements are allegedly inconsistent with 2012 statements by Sheymov.*** D.I. 54 at 9. ***This argument is not well-conceived by Plaintiffs. First, no "falsity" can be inferred from statements by different people, nearly four years apart and on different topics.*** Mr. Esrey was providing an update on the company's affairs in late 2008, with a focus on possible deals with potential clients. D.I. 1 at 9. Sheymov was discussing Invicta's status in 2012, including efforts to sell the company or its technology. Id. at 13. Given the very different circumstances, the later statements could not plausibly render the earlier statements untrue. ***Second, Sheymov's statements cannot be the standard of "truth" used to attack Mr. Esrey's statements, because Plaintiffs allege Sheymov's statements were themselves false.*** Id. at 18. Plaintiffs' argument is illogical. Third, the content of the communications reveals that the alleged "contradictions" are illusory. Nothing about the statement that Invicta would be more profitable in 2012 if it had contracts with the government is inconsistent with the notion that, four years earlier, Invicta had preliminary business dealings with governmental entities. Likewise, nothing about the statement that, in 2012, there was not much chance of doing business in the private sector was inconsistent with the idea that Invicta had previously worked with a private sector utility. ***A prediction of the future is generally not actionable*** (*Fabbro v. Drx Urgent Care, LLC*, 616 F. App'x. 485, 488 (3d Cir. 2015); *Sindecuse v. Katsaros*, 541 F.3d 801, 803 (8th Cir. 2008)) ***and a prediction of the future is certainly not made false because it differs from a past event.*** Sheymov's 2012 statements were not

literally identical to Mr. Esrey's 2008 statements, but that does not render them contradictory or establish a plausible inference that Mr. Esrey's statements were false.

> ***Plaintiffs contend that they should be excused from Rule 9(b)'s rigors because "Esrey's precise actions and inactions that underlie the alleged fraud are peculiarly known to Esrey."*** D.I. 54 at 6; *see also id.* at 8, 10. ***This argument totally ignores the procedures available to Plaintiffs, which they ignored.*** As shareholders of a Delaware corporation, Plaintiffs had the right to enforce a demand for corporation documents through a suit in Chancery Court. 8 Del. C. § 220(b). ***Had they followed the procedures in Section 220 and sued in the Chancery Court to enforce their demand, they might have obtained the information they now contend is "peculiarly known to Esrey."*** They chose not to and cannot now contend that they should be excused from Rule 9(b), because they failed to take reasonable steps to obtain the required information. As the Delaware Supreme Court has noted, Plaintiffs must make use of "the 'tools at hand' to develop the necessary facts for pleading purposes." *Brehm v. Eisner*, 746 A.2d 244, 249 (Del. 2000).

Reply pp. 2-3 (***emphasis*** added). *Si tacuisses, philosophus mansisses*, as the saying goes.[18]

---

[18]    The saying is based on a passage from The Consolation of Philosophy, written by Anicius Manlius Severinus Boëthius, commonly called Boethius, a Roman senator, consul, magister officiorum, and philosopher of the early 6th century:

> nam cum quidam adortus esset hominem contumeliis, qui non ad uerae uirtutis usum ad superbam gloriam falsum sibi philosophi nomen induerat, adiecissetque iam se sciturum an ille philosophus esset si quidem inlatas iniurias leniter patienterque tolerasset, ille patientiam paulisper assumpsit acceptaque contumelia uelut insultans: "iam tandem," inquit, "intellegis me esse philosophum?" tum ille nimium mordaciter: "intellexeram," inquit, "si tacuisses."

> A certain man had heaped insults on a man who had falsely labeled himself a philosopher, but not for the purpose of true virtue but rather for vainglory, and he then added that he would soon know whether the man was really a philosopher or not based on whether he patiently and meekly put up with the insults spoken against him. That man put on a show of patience for a little while as if accepting the insults and scoffing at them. Then he said, "Now can you see that I am a philosopher?" Then the first man said quite cuttingly, "I might, if you had kept quiet."

http://audiolatinproverbs.blogspot.com/2007/01/si-tacuisses-philosophus-mansisses.html (last visited Jan. 27, 2018.).

**Act V**

**Matt Admits to Defense Counsel He Will Not Amend**
**the Complaint for Fear an Amended Complaint Will Be Wholeheartedly Rejected**

30.     It is to this Reply that the Director defendants attach an April 25 to May 3, 2016

email exchange with Matt (Ex. D), in which he bemoans the fact that the Complaint is not

satisfactory to the Directors and speculates that he will never be able to amend the Complaint such

as to make the Directors happy. Specifically, he states:

> Mark [Thornhill, the Director defendants' Missouri counsel],
>
> We've discussed extensively and *we do not intend to amend Plaintiffs' Complaint at this time*. We believe the process outlined during the call is not efficient, *particularly where your clients have invited us to participate in a proceeding that they likely will oppose*.
>
> Please understand that we also reserve all of Plaintiffs' rights under Rule 15, including their rights under Rule 15(a)(1).

April 25 email (*emphasis* added). Mark responds on April 27:

> You state the opinion that the Director Defendants "likely" would oppose a motion for leave to amend the complaint. You do not state any reason for your opinion. Certainly, the opinion could not be due to the position of the Director Defendants. I pledged, on behalf of the Director Defendants, to review in good faith any proposed amendment. I offered the possibility of a stipulation to filing an amended complaint. Due to your position, however, the matter is moot. The Director Defendants will file their motion to dismiss the complaint on the schedule approved by the Court.

Matt responds on May 3:

> *We based our conclusion primarily on two factors:*
>
> *1. The Director Defendants conclusively and unequivocally stated in their Reply brief that it was their view any amendment would be futile* … Thus, notwithstanding your comments about making a "good faith" evaluation of an amended pleading, it seems pretty clear that the Director Defendants would oppose any proposed amendment.

*2. Even without these statements, the motion filed by the Director Defendants represented a wholesale, unmitigated rejection of the entire Complaint.* The Director Defendants asked the Court to (inappropriately) make credibility determinations and weigh evidence at the dismissal state, and they asked the Court to take the extraordinary step of dismissing the Complaint WITH prejudice.

*Given the scope of the Director Defendants' motion, it seems unlikely that there is any version of the Complaint that would satisfy them.*

I agree the point is moot, but I also believe that we have a reasonable basis for our conclusion, and it's our position that, given the Director Defendants' likely position to any amended pleading, it would be inefficient for the Court and the parties to adopt your proposal.

(*emphasis* added, ALL CAPS in original). In other words, Matt would rather trouble the Court with briefing on yet another motion to dismiss concerning *the same* Complaint that the Director Defendants already "wholesale[ly] [and] unmitigated[ly] reject[ed]" (his words) than invest the effort required by the ethical rules of professional conduct and amend the Complaint for fear of double rejection by the Director Defendants.

## Act VI

### <u>The Delaware District Court Correctly Finds That Matt's Complaint is Barebones</u>

31.    There is radio silence on the case's docket until April 19, 2017, when Judge Robinson issues an order and opinion with a *Paukenschlag* that would have made Franz Joseph Haydn[19] proud.  MTD 2 granted, Complaint dismissed.  Like Judge Sachs, Judge Robinson concludes that the claims asserted against the Directors are "paradigmatic derivative" in nature:

> *Plaintiffs argue that counts 1 and 2 are direct, because non-disclosure claims are direct.* […] *Although non-disclosure claims generally are direct, counts 1 and 2 do not allege that the director defendants breached their fiduciary duties by failing to disclose material to shareholders. Rather, counts 1 and 2 allege that the*

---

[19]    Haydn composed Symphony No. 94 in g major, commonly known as the Surprise Symphony (*Die Symphonie mit dem Paukenschlag*).

> director defendants *"fail[ed] to exercise diligence and oversight over the company's officers and agents*, including in matters where those individuals made representations to the company." Delaware courts have found that "any harm stemming from … oversight failures that allowed [the company] to make material misstatements … accrues to [the company] itself and to its stockholders only indirectly," *making those claims derivative, not direct. Sandys v. Pincus*, 2016 WL 769999, at *5 (Del. Ch. Feb. 29, 2016), rev'd on other grounds, 152 A.3d 124 (Del. 2016).

*Invicta I*, 249 F. Supp. 3d at 794 (citations to Complaint omitted) (*emphasis* added). She also finds that the Complaint fails to state a claim for fraud:

> *In contravention of Fed. R. Civ. P. 8(a), count 7 is nothing more than a threadbare recital of the elements of a cause of action.* The complaint contains no factual basis to support its conclusory assertion that the false statements were material and no allegations from which it could be plausibly inferred that Esrey made the statements with the intent to induce action (or inaction) by plaintiffs in reliance. *Indeed, it is notable that, while all three plaintiffs assert this fraud claim against Esrey, the complaint alleges that Esrey sent his e-mails only to Marshal Simpson and Marshal Simpson passed the information on to other plaintiffs.* In addition, under Fed. R. Civ. P. 9(b), the complaint must allege the "who, what, when, where and how" of each fraudulent misrepresentation. *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016). *Plaintiffs, however, fail to identify which statements within the four e-mails were false, let alone "how" or "why."* Accordingly, count 7 for fraud must be dismissed for failure to state a claim.

*Id.* at 796 (*emphasis* added). Despite this damning language, the claims, however, were dismissed "without prejudice" and Dameron, therefore, could have sought to amend the Complaint. *Id.* p. 9. He did not.

32.     The day after dismissing the Complaint as to the Director defendants, the Court issues an order for a status report to see what is going on with the remaining defendants. By the Status Report Dameron files on May 22, 2017, a copy of which is attached hereto as **Exhibit J**, defendants (and the Court) for the first time learn that Invicta *had in fact already been served over*

*two years ago*, on April 20, 2015. Apparently, Matt simply never got around to filing a proof of service with the court(s), nor does it seem to have occurred to him that, given all the discussions regarding failure to join an indispensable party due to lack of service, perhaps, maybe, the fact of service should be disclosed to the Court.

33.     The Status Report also is remarkable in that it sheds light on just how creative the service attempts upon Mr. Sheymov initially were:

> After Plaintiffs initiated litigation, Plaintiffs attempted to achieve service of process on Mr. Sheymov via three methods: (1) mailed Mr. Sheymov waiver of service information at his home address and via electronic mail – the same contact addresses previously used by counsel; (2) hired a private process server to attempt to personally Mr. Sheymov at his residence; and (3) retained the Sheriff's Office in Fairfax County, Virginia to assist with service of process. None of these efforts were successful.

It is apparently not until years after the Complaint is filed that Dameron discovers what is perhaps the most common form of service on nonresident officers of Delaware corporations: 10 Del. C. § 3114(b) (providing for service of a nonresident director by serving the corporation's registered agent or, where none, the Delaware Secretary of State).

34.     On May 24, the court issues a two-fold order: (1) serve Mr. Sheymov (by way of the newly discovered method) and (2) seek entry of default against Invicta (which had been served two years ago but failed to appear).

35.     By notice dated June 15, Dameron stated Mr. Sheymov had been served by serving (a) Invicta's registered agent (although it is not clear how this could be accomplished, given Invicta's charter has been revoked) and (b) the Delaware Secretary of State. By notice dated June 20, Dameron stated that the Delaware Secretary of State had identified several errors with the service papers:

25

We have received the documents that were submitted to our office on your behalf. Please be advised we cannot accept the documents in the manner they were sent and are refusing to accept service based on the reason(s) checked below.

- _____ Incorrect or no fee attached The correct fee is $ 50.00 per each defendant and each Title & Section being served.

- ___XX___ Incorrect number of copies provided. Provide three (3) complete copies for This office.

- _____XX_____ Incorrect name (or no) address is provided for the defendant. A valid address must be provided for this office to forward the service/ wage attachment.

- _____ Defendant is a Delaware entity in good standing and must be served on its Registered Agent/Trustee. Our records list the information as:

- ___XX_____ Must state Title and Section of Delaware Law. Only accepting Title 10, Sections 3104, 3114.

- ___XX_____ Other: All documents must be served upon this office by the Sheriff, Constable, or Special Process Server. Unless documents are from a Federal Court, service is not acceptable through the mail.

**Once the above corrections have been made, please contact the Sheriff, Constable, or Process Server, as applicable, for service upon the Secretary of State of Delaware. DO NOT RETURN the documents and/or fees directly to the Secretary of State as this is NOT LEGAL service of process.**

Dameron further stated that the errors had been corrected and the service package resubmitted to the Secretary of State.

36.     As ordered, Dameron seeks default against Invicta, which it obtains on August 2, 2017.

37.     On August 16, Mr. Sheymov and Invicta enter their appearance, and Invicta files a *Motion to Set Aside Default Judgment* that remains unopposed and is approved on August 22.

38.     Meanwhile, the case is reassigned to Judge Mark. A. Kearney, due to the retirement of Judge Robinson.

39.     Invicta and Mr. Sheymov move to dismiss the Complaint on September 20 (the "MTD 3"). The reasons for dismissal in the MTD 3 are substantially identical as those in MTD 1

and MTD 2, with the additional argument that Judge Robinsons' opinion dismissing the derivative and fraud claims are law of the case and bars relitigation of those issues.

40. Judge Kearney orders a Rule 16(f) pretrial conference.

## Act VII

### The Pretrial Conference, or,
### How Matt Convinced the Court that Dismissal Should be With Prejudice

41. Which brings us to the closing act in this drama: the Rule 16(f) pretrial conference, which was held on Friday, October 6, 2017. Rule 16(c) contains a list of 15 matters appropriate for consideration at a Rule 16(f) conference and Judge Kearney addressed most, if not all of them. He took his duties seriously. *See* Oct. 6, 2017 Hearing Transcript, attached hereto as **Exhibit K** (the "Hrg. Tr."). He saw his role much as that of a *deus ex machina*, wanting to solve the hopeless plot of the Complaint:

> THE COURT: So, what I'd like to do is to take the complaint and run through the complaint with the allegations […] and allow us to go piecemeal through them, mindful of Judge Robinson's ruling and mindful of the law in other -- in other context concerning the standing and fraud and those types of things that have been addressed.
>
> So, let me turn to the plaintiff and start, if you would, with telling me, why Count 1 would stay in, given Judge Robinson's opinion, that -- it seems to me, to be the law of the case, no motion or amendment was filed. She offered a motion to amend.

Hr'g Tr. 4:8-19.

> THE COURT: What I am asking you, is tell me, what it is you would need by way of discovery under 9(b) to -- if I gave you leave to amend, what is it that you would be able to plead based upon the public record, if anything now, that would show this?
>
> Because I don't know, necessarily, you'd have enough yet and I don't know that you would have enough without doing, essentially, a 220 or some type of corporate procedure to find out

what's going on here, because I don't know how you would get this information.

*Id*. 40:17-25.

42.     Unfortunately for the Clients, however, Judge Kearney did not get much assistance from the protagonist: Matt.  Here is how the case went from *I am likely to let you amend even if I deny the MTD 3*[20] to a dismissal of the Complaint on all counts with prejudice only twelve days later:

> MR. DAMERON: Judge Robinson went through – did an analysis for three defendants, who were members of the Board of Directors for Invicta, they were not officers.
>
> In this case, our claims [are against] Invicta Network, the company itself, but also against Victor Sheymov and it's stipulated that Victor Sheymov was the President and CEO and Chairman of the Board.
>
> And we think, we have a stronger argument for a direct claim against him, because our argument is that he was acting in bad faith – and so, the derivative piece doesn't really come in to the equating, your Honor, because he was an officer of the company, he was the operator of the company.

---

[20]     THE COURT: Under Twombly -- let's cut right through it – under Twombly, even if I were to grant the defendant's motion on 9B, given that these two gentlemen have not responded yet, this would be their first chance -- this would this -- would be their first -- this would be your first shot at Invicta and – and Sheymov. I would be likely to do what Judge Robinson did and that was grant without prejudice to amend.

*Id*. 12:8-14.

> THE COURT: All right.
>
> My order, I'm going to decide this -- I'm going to decide the motion, but I'm going to let you file the brief next -- whenever the 11th is.
>
> But my order -- the scheduling order that will come out should I -- should I grant you leave or -- or allow it to go forward -- it is going to require you to do a 408 demand. I think you should be realistic about that 408 demand --
>
> MR. DAMERON: Of course.

*Id*. 84:3-11.

THE COURT: ***But that's not how you define director or derivative***, though, you know that, it's whether the harm is to the – to your clients.

So, how is the harm that's alleged in Count 1, not your fraud, the harm that's alleged in Count 1 and -- and it's in Paragraph 95, failing to exercise diligence and oversight, is the standard of care right out of -- right out of [*Van Gorkom*]: The failure to exercise diligence and oversight, the exercise diligence and oversight -- that I didn't exercise diligence and oversight, breach of the duty, it's -- it's [*Van Gorkom*]

So, tell me how that's not derivative.

MR. DAMERON: And it may be, your Honor.

THE COURT: So, if it is and you have no demand, what do we do?

MR. DAMERON: Well, we would still argue that demand would be futile here, given a demand against Mr. Sheymov would certainly have been futile in his role as CEO and President of the company.

THE COURT: ***But if you don't plead -- my point is, that may be true, but if you don't plead it and Judge Robinson gave you leave to do so and you didn't, so I have the law of the case.***

MR. DAMERON: Sure.

THE COURT: So, is it something where you're abandoning this, I mean, I -- I don't like to throw away cases without giving you a chance to tell me, Judge, I'm going to withdraw that or here's why.

*Id*. 5:3-6:18 (***emphasis*** added).

THE COURT: [addressing Dameron] [W]hat is your view on venue, if the – if you lack standing to bring the derivative claim?

MR. DAMERON: Honestly, I've been giving that a lot of thought, your Honor.

*Id*. 11:7-10.

THE COURT: Okay.

But -- but let's assume -- let's back up a second.

If somebody writes a -- something being un-hackable in 2006, cannot be a fraud as to something happening in 2011.

So -- so, I'm trying to pin down -- I'm trying to understand what you're saying is the fraud. The fraud would be --

29

MR. DAMERON: Well, honestly, your Honor --

THE COURT: -- you -- you don't know it was false in 2006, you're just saying, 2011 that's not true, because it was hacked.

MR. DAMERON: Right.

*Id*. 30:18-31:2.

THE COURT: Do you believe that balance sheet is false?
MR. DAMERON: I think at this stage of the pleadings, given the standard, ***you can draw a reasonable inference that they're false***
…
Well, how does a company -- Paragraph 41 – actual total liabilities in equity, those are the net positives – ***how does a company have a balance sheet of $6.9 million in 2005 and by 2012, it's completely unable to even conduct routine bookkeeping or you know, other sort of basic corporate functions?***

*Id*. 30:18-31:2 (***emphasis*** added).

MR. DAMERON: ***And look, we've pled these upon information and belief, your Honor, I mean, you know, admittedly, we don't have a direct line, but I don't think that's what the standard requires at this stage of the proceedings.***

THE COURT: ***It does require, though -- it does – it does require some ability to say, why you believe something is false at the time of the say.***

And it seems to me, what you're saying is, Judge, it should be false, because at a later date, there is no evidence of any of this happening.

MR. DAMERON: Right.

*Id*. 35:15-21(***emphasis*** added).

THE COURT: Do you think that statement is false?

MR. DAMERON: Again, viewing all of the evidence in the totality, yes, your Honor, because --

THE COURT: If I were to take your argument, let's -- let's say this, let's say, you have a start-up company that says, we're going to -- we're going to do all of this and we've passed all these tests and then, the world changed, you know, it's no -- it's no longer a -- you know, it's no longer a Blackberry world, it's an iPhone world.

MR. DAMERON: Sure.

THE COURT: Does that make the Blackberry representations at the time, it was a Blackberry world false?

MR. DAMERON: No, your Honor.

THE COURT: Okay.

So, tell me what the difference is here?

*How would the world just change -- how about if the -- the world changed and -- and what we thought was happening in 2008, it's not going to happen anymore and we're -- and our business plan is -- is no longer viable, how does that make it fraud?*

MR. DAMERON: *Well, it doesn't.*

*Id.* 36:19-37:14 (*emphasis* added).

MR. DAMERON: I mean, part of the issue driving this, your Honor, is the company has never provided any sort of accounting to the plaintiffs about -- ah --

THE COURT: Well, that's the 220 demand, right, I mean, that's -- that's still the law in Delaware?

MR. DAMERON: Right.

THE COURT: So, that may be true.

But if this were a chancery case, I think the chancellors would say to you, go do a 220 and come back --

MR. DAMERON: Hm-hmm.

THE COURT: -- with more specifics, you're not there.

So, I appreciate you're saying, we need more information to get there. Under 9B, I don't know how far I can go based upon your thought that it seems, likely, that this would be true, if -- if the statements that are made, for example, passed all tests conducted by governments and private entities in the 2009 PPM, that is something that is empirically provable. And yet, *you don't -- you don't know today, whether that's false.*

MR. DAMERON: I don't know that, because we haven't been able to engage in discovery.

But no, *that's correct, your Honor, I don't know –*

*Id.* 38:11-39:7 (*emphasis* added).

MR. DAMERON: And there, your Honor, he's representing that there are company books and then, later, he represents that there are no funds to even maintain financial records.

Well, presumably, they're --

THE COURT: Well, they're two different things.

MR. DAMERON: Sure.

THE COURT: -- a stock ledger is different than a financial statement.

MR. DAMERON: Right.

*Id.* 45:2-10.

THE COURT: But when you did the high workload – when he says, there's a high workload, the ownership records and the company's books, are you saying, you never got those books, you never got to see their stock certificates?

MR. DAMERON: Correct […]

THE COURT: -- […]

Did you file any type of petition to get the certificates turned over?

MR. DAMERON: No, your Honor.

*Id.* 45:11-46:2.

MR. BRAUERMAN [counsel to Invicta]: The fact of the matter is, there were -- so, they invest in 2009, they're talking about it, they get a shareholder update in 2011. They never -- the update says, that they're not going to get stock records, they don't make any effort to pursue that.

But this is what happens, your Honor, there is a history of this, right, they made a 220 demand, they abandon it.

They throw up a whole bunch of things in a complaint, Judge Robinson dismisses it, they made no effort to amend.

We move to dismiss on identical grounds. They make us respond, they make the court deal with this, it's --

*Id.* 60:2-12.

43.     On October 11, 2017, which is the second business day after the Pretrial Conference, Dameron files its standard non-responsive response to Invicta's motion to dismiss.

44.     Compared to the Pretrial Conference, the October 18, 2017 Opinion dismissing the Complaint as to the last two remaining defendants with prejudice is unremarkable.  This is so because it largely adopts as its own those factual findings and conclusions of law that (a) had already been eloquently argued by defendants (and not addressed by Dameron) in three rounds of motion practice and (b) two other district court judges before it had penned in similar fashion.  In a nutshell, Judge Kearney faults the Clients for "inexplicably" abandoning the Section 220 Demand. *Invicta II*, 2017 U.S. Dist. LEXIS 172247, *8 (D. Del. Oct. 18, 2017).  For not explaining why they could not sue within the applicable statute of limitations.  *Id*. * 2.  For not describing their reliance.  *Id*. **19-20.  And for failure to allege fraud with particularity.  *Id*.  The Opinion closes as follows:

> The Investors elected not to amend their complaint to cure deficiencies. During oral argument, the Investors' counsel candidly conceded he knew of no additional facts to plead. The Investors admit wanting discovery to see if they can find fraud. [W]e find no basis to allow yet another time period to find facts they admit are not available to them.

*Id*. *21.  The case was closed the same day.

### COUNT I
### Negligence, a/k/a Legal Malpractice
### (Against Matt and the Firm)

45.     Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

46.     Plaintiffs requested that Dameron provide them legal services in connection with their claims against Invicta and its officers and directors, and Dameron agreed to provide those services.  This is evidenced by the Agreement, and also by the fact that Dameron filed suit on behalf of all Plaintiffs.  While the Agreement is only with Mr. Simpson, an attorney-client

relationship existed with respect to all individual Plaintiffs, because it was implied from Dameron's actions on behalf of them.

47.     As their attorneys, Dameron owed the Clients the duty to exercise the care, skill, and diligence that are commonly exercised by other attorneys in similar conditions and circumstances.

48.     In providing legal services to the Clients, Dameron failed to exercise the care, skill, and diligence that are commonly exercised by other attorneys in similar conditions and circumstances. Dameron holds itself out to be experienced trial attorneys with business litigation and class action experience. This kind of work, at a minimum, would require the care, skill, and diligence to

> a.     Draft a complaint that pleads the elements of the causes of action sued upon;
>
> b.     Effectively effectuate service, not, as here, choose ineffective methods for effecting service or ones not authorized by law;
>
> c.     Diligently advance the Client's case, not, as here,
>
> > i.     Abandon the Section 220 Demand that would have produced facts, according to Dameron, the Clients needed to sufficiently replead the Complaint, something that ultimately proved fatal to the Clients' case;
> >
> > ii.     Sue in the wrong jurisdiction, something that, in the Clients' case, caused a delay of almost two years (think evidence, memories being lost);
> >
> > iii.     Fail to sufficiently familiarize oneself with legal precedent relevant to the Clients' case, including applicable foreign law, so as to be

able to give competent legal advice and competently evaluate the Clients' legal options;

    iv.    Fail to seek entry of default against a defendant for two years;

    v.    Fail to disclose to the court that a defendant had been served, thereby misleading the Court and defendants about who is a party to the action and who is not and impinging upon the Clients' credibility with the Court;

    vi.    Fail to even attempt to amend the Complaint;

    d.    Sufficiently prepare for the Pretrial Conference so as to be in a position to competently provide answers to the court's factual and legal inquiries concerning the case.

    e.    Communicate regularly with the Clients and keep the Clients abreast of the most current case status and new developments.

49.    As is set forth in detail above, Dameron failed to adhere to this most basic set of care and skill that is owed by all attorneys to their clients.

50.    Its failure to do so was not just multiple instances of violations of rudimentary legal ethics, it also was negligent. While an attorney can never promise or insure a particular outcome, intentional failure to act on the basis of not being adequately informed with the subject matter of the representation – both factual and legal – indisputably is the worst kind of legal strategy. A reasonably prudent attorney with the skill and competence level necessary to provide the same legal service would have pursued the Section 220 Demand in order to bolster the Clients' case and would not have declined to amend the Complaint for fear that such amendment would be opposed

by defense counsel. That reasonably prudent attorney also would have done a host of other things differently from Dameron; for example, be honest with the tribunal and opposing counsel.

51.     Dameron knew that Plaintiffs' claims were viable, otherwise it would not have brought suit. *See* Agreement ¶ 2. The Clients received settlement offers from Defendants and referred Defendants to Dameron for settlement discussions. Clearly, Defendants agreed that Plaintiffs had valid claims against them. As Matt himself admits, settlement after a complaint is dismissed with prejudice is unlikely to be had. Dameron's failure to adhere to any perceptible standard of care transformed actual settlement offers into a pipe dream. Otherwise put, the former proximately caused the Clients' damage in the form of lost recovery of their claims against Defendants.

52.     Dameron's breach proximately caused the Clients to suffer damages in an amount to be determined at trial.

### COUNT II
### Breach of Fiduciary Duty
### (Against Matt and the Firm)

53.     Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

54.     Plaintiffs requested that Dameron provide legal services to them in connection with their claims against Invicta, and Dameron agreed to provide those services. This is evidenced by the Agreement, and also by the fact that Dameron filed suit on behalf of all Plaintiffs. While the Agreement is only with Mr. Simpson, an attorney-client relationship existed with respect to all individual Plaintiffs, because it was implied from Dameron's actions on behalf of them.

55.     As their attorneys, Dameron owed the Clients the fiduciary duty to act in the Clients' best interest.

36

56.     Dameron breached their fiduciary duty owed to the Clients by putting the interests of other clients before that of the Clients. As is clear from Dameron's multiple deliberate decisions not to, for example, follow through with the Section 220 Demand or amend the Complaint (or to bother involving Clients in decisions on whether to amend and seek their input on pleadings prior to filing them with the Court), Dameron had bigger fish to fry elsewhere and chose to fry those rather than the Clients'. Whether or not they intended to do so is irrelevant under Missouri law.

57.     Dameron's breach proximately caused the Clients to suffer damages in an amount to be determined at trial.

## COUNT III
## Vicarious Liability/Respondeat Superior
## (Against the Firm)

58.     Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

59.     As is described in detail above, Matt, as the Firm's actual or apparent agent and employee, negligently caused the Clients damages and breached the fiduciary duty he owed them as their counsel of record.

60.     Matt's negligent actions and breach of fiduciary duty were within the actual or apparent scope of his employment with the Firm. As the Firm's agent, Matt was owed the Clients the duty to exercise the care, skill, and diligence that are commonly exercised by other attorneys in similar conditions and circumstances and owed the Clients the fiduciary duty to act in the Clients' best interest.

61.     The acts complained of occurred during normal business hours at the Firm.

62.     The acts complained of were in furtherance of the Firm's business.  The Clients are precisely the kinds of clients the Firm solicits, and Matt used authority actually delegated to him by the Firm as his employer when he provided the negligent services to the Clients.

63.     As a result of Matt's conduct, the Clients suffered damages in an amount to be determined at trial.

64.     Under the theory of respondeat superior, the Firm is vicariously liable for Matt's negligence and breach of fiduciary duty.

## COUNT II
## Negligent Hiring, Retention & Supervision
## (Against the Firm)

65.     Plaintiffs repeat and reallege the allegations in the foregoing paragraphs as if fully set forth herein.

66.     The Firm has the duty to ensure that the attorneys it hires are of such qualifications and character that they will not, as here, harm their clients.  The Firm has the duty to regularly review its attorneys' and equity partners' qualifications and character to determine whether such attorneys and equity partners should be retained or terminated.  The Firm owed the Clients the duty to ensure that the attorney it assigned to manage their case was knowledgeable about relevant legal concepts and able to handle the matter on his own.  Here, it unquestionably failed to do so. It permitted Matt, as its actual or apparent agent, to engage subpar conduct defying any standard of care, and was negligent in so doing.

67.     As a direct result of the Firm's negligence, the Clients suffered damages in an amount to be determined by a jury in a trial on this matter.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests the Court enter judgment in their favor

Defendants, and grant such other and further relief as this Court deems just and reasonable.

Dated: February 8, 2018
      Wilmington, Delaware

KLEIN LLC

*/s/ Julia Klein*
Julia B. Klein (Bar No. 5198)
919 North Market Street
Suite 600
Wilmington, Delaware 19801
Phone: (302) 438-0456

*Counsel for Plaintiffs*